1

2

3

4

5

6        IN THE UNITED STATES DISTRICT COURT FOR THE

7              EASTERN DISTRICT OF CALIFORNIA

8

9   JEFF GILBERT,                )      No. CV-F-05-1627 OWW/GSA
                                 )
10                               )      MEMORANDUM DECISION GRANTING
                                 )      DEFENDANTS' MOTION FOR
11              Plaintiff,       )      SUMMARY JUDGMENT (Doc. 38)
                                 )
12         vs.                   )
                                 )
13                               )
    OFFICER BALDWIN, et al.,     )
14                               )
                                 )
15              Defendants.      )
                                 )
16 _____)

17      Plaintiff Jeff Gilbert, a state prisoner proceeding *in pro*

18 *per*, is proceeding pursuant to an Amended Complaint against

19 Defendants Inyo County Sheriff's Department Officers Paul

20 Baldwin, Jamery Ray, and the County of Inyo.  Plaintiff alleges

21 that his rights to due process and equal protection of the laws

22 under the Fourteenth Amendment were violated by the officers' use

23 of excessive force and "failure to act."  The Amended Complaint

24 alleges:

25          On .01/20/04, at approximately 12:00 hours
            Plaintiff in an nonlogical [sic] state of
26          mind entered a home with intentions [sic] to

                           1

get shelter from the Bishop, California.
weather i had stayed in the residence for 4
to 5 days.  I began to drink, I became very
depressed.  I got a gun from my truck and was
contemplating sucide when I saw two officer's
arrive on the scene, Ofc. Paul Baldwin and
Jamery Ray ... The door was locked they said
it was the sheriff's department they also had
a canine unit which was barking aggressively
and the sound of the officer's was difficult
to here.  The first officer stepped in
simultanously I began to raise my weapon
befor it was copletly up Ofc. Paul Baldwin
had shot the gun completely from my hand
severing my finger, Then shooting the
plaintiff three more times.  The 2nd shot was
Fired into the plaintiff's left arm, between
my wrist and elbow breaking both bones.  In a
defensive move I raised my right hand to
protect my face.  The 3rd shot went through
the palm of my right hand.  The fourth shot
went through my right arm as I was rolling
off the bed onto the floor ...

... [T]he plaintiff contends that the
application of force was no longer needed to
maintain or restore oder once the defendant,
fired the first shot knocking the gun from
the plaintiffs hand, and severed the
plaintiffs finger off.  Instead the defendant
maliciously and sadistically fired 3 more
additional shots at the plaintiff for the
very purpose of causing harm.

...

... [P]laintiff contends that defendant
Jamery Ray violated plaintiff's rights to due
process and equal protection of the laws,
where as he failed to act to prevent
defendant Paul Baldwin use of excessive force
despite having the duty to do so. [SIC]

The Amended Complaint alleges Defendant Inyo County failed to

properly train Defendant Baldwin "on policy and customs that

prevent the deprivation of plaintiff's Fourteenth Amendment right

against the excessive use of force."

2

1  Defendants move for summary judgment in connection with
2  Plaintiff's claims on the grounds of qualified immunity from
3  liability under 42 U.S.C. § 1983 and on the ground that Inyo
4  County's policy and practice regarding the use of force is
5  constitutional.

6  Plaintiff has not filed an opposition to the motion as
7  required by Rules 78-230 and 56-260, Local Rules of Practice, and
8  did not make arrangements to appear in opposition to the motion
9  by telephone.  Plaintiff, who is incarcerated, was served with a
10 "Second Informational Order and Summary Judgment Notice" on April
11 6, 2006 (Doc. 13), which advised Plaintiff, pursuant to *Klingele*
12 *v. Eikenberry*, 849 F.2d 409 (9th Cir.1988), of the requirements
13 to oppose a motion for summary judgment.

14 A.  <u>GOVERNING STANDARDS</u>.

15 Summary judgment is proper when it is shown that there
16 exists "no genuine issue as to any material fact and that the
17 moving party is entitled to judgment as a matter of law."
18 Fed.R.Civ.P. 56.  A fact is "material" if it is relevant to an
19 element of a claim or a defense, the existence of which may
20 affect the outcome of the suit.  *T.W. Elec. Serv., Inc. v.*
21 *Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th
22 Cir.1987).  Materiality is determined by the substantive law
23 governing a claim or a defense.  *Id*.  The evidence and all
24 inferences drawn from it must be construed in the light most
25 favorable to the nonmoving party.  *Id*.

26 Even though Plaintiff has not filed an opposition to

Defendants' motion as required by Rule 56-260, Local Rules of
Practice, summary judgment may not be granted on that ground
alone. *See Henry v. Gill Industries, Inc.*, 983 F.2d 943, 950
(9th Cir.1993). The initial burden in a motion for summary
judgment is on the moving party. The moving party satisfies this
initial burden by identifying the parts of the materials on file
it believes demonstrate an "absence of evidence to support the
non-moving party's case." *Celotex Corp. v. Catrett*, 477 U.S.
317, 325 (1986). The burden then shifts to the nonmoving party
to defeat summary judgment. *T.W. Elec.*, 809 F.2d at 630. The
nonmoving party "may not rely on the mere allegations in the
pleadings in order to preclude summary judgment," but must set
forth by affidavit or other appropriate evidence "specific facts
showing there is a genuine issue for trial." *Id*. The nonmoving
party may not simply state that it will discredit the moving
party's evidence at trial; it must produce at least some
"significant probative evidence tending to support the
complaint." *Id*.[1] As explained in *Carmen v. San Francisco
Unified School District*, *supra*, 237 F.3d at 1031:

> [T]he district court may determine whether
> there is a genuine issue of material fact, on
> summary judgment, based on the papers
> submitted on the motion and such other papers
> as may be on file and specifically referred
> to and facts therein set forth in the motion

---

[1]A plaintiff's verified complaint may be considered as an
affidavit in opposition to summary judgment if it is based on
personal knowledge and sets forth specific facts admissible in
evidence. *Lopez v. Smith*, 203 F.3d 1122, 1132 n.14 (9th Cir.2000).
Here, however, the Amended Complaint is not verified.

> papers. Though the court has discretion in appropriate circumstances to consider other materials, it need not do so. The district court need not examine the entire file for evidence establishing a genuine issue of material fact, where the evidence is not set forth in the opposing papers with adequate references to that it could conveniently be found.

The question to be resolved is not whether the "evidence unmistakably favors one side or the other, but whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented." *United States ex rel. Anderson v. N. Telecom, Inc.*, 52 F.3d 810, 815 (9th Cir.1995). This requires more than the "mere existence of a scintilla of evidence in support of the plaintiff's position"; there must be "evidence on which the jury could reasonably find for the plaintiff." *Id*. The more implausible the claim or defense asserted by the nonmoving party, the more persuasive its evidence must be to avoid summary judgment." *Id*.

B. **DEFENDANTS' STATEMENT OF UNDISPUTED FACTS**.

Defendants set forth the following statement of undisputed facts in support of their motion for summary judgment.

**UMF 1**. On January 26, 2004, Deputy Paul Baldwin of the Inyo County Sheriff's Department was working the night shift patrol (8:00 p.m. to 4:00 a.m.) in the Northern Division of Inyo County. At approximately 9:30 p.m., he received a call from Inyo County Sheriff's Dispatch advising that a call had been received from a female reporting party, from the Aspendell area, and that the female reporting party advised that when she had arrived home

1  that night, after having been gone for the weekend, she observed,

2  from outside her home, and while looking through a front window,

3  a strange man inside her home watching television. The address of

4  her home was 127 Cardinal Road, Aspendell.  Declaration of Deputy

5  Paul Baldwin, 9/24/07 ("Baldwin Declaration"), ¶ 3.

6       **UMF 2**.  Inyo County Sheriff's Department Corporal

7  Jamery Ray, who was working as a K-9 unit in the Northern Area,

8  followed Deputy Baldwin to Aspendell and assisted in the response

9  to this call. Baldwin Declaration, ¶ 4.

10       **UMF 3**.  Deputy Baldwin and Corporal Ray arrived in the

11  Aspendell area at approximately 9:50 p.m.  It was dark outside.

12  Baldwin Declaration, ¶ 5.

13       **UMF 4**.  Deputy Baldwin contacted the reporting party,

14  Ms. Camille Suetos, who was at a neighbor's house.  Deputy

15  Baldwin was told  by Ms. Suetos that she and her neighbor placed

16  a telephone call to her home and that a man whom she did not know

17  answered.  The man told her that someone named "John Anderson"

18  had told him he could stay there.  Ms. Suetos advised Deputy

19  Baldwin she told the man that he was in the wrong house, that it

20  was her house, that he was trespassing, and that he had to leave.

21  Baldwin Declaration, ¶¶ 6 & 7.

22       **UMF 5**.  Ms. Suetos gave Deputy Baldwin a key to her

23  residence, and permission to enter.  Baldwin Declaration, ¶ 8.

24       **UMF 6**. Deputy Baldwin and Corporal Ray decided to drive

25  to the Suetos residence at 127 Cardinal Road, park a house or two

26  away, walk up to the house, ring the doorbell, announce that the

Sheriff's Department was present, and then, if the person did not answer or reveal his presence, they would open the door, make the canine announcement, and hopefully, the man would come out. Baldwin Declaration, ¶ 8.

UMF 7.  They approached the residence.  There were no lights on inside or outside the house.  Deputy Baldwin rang the door bell, but did not hear a ring.  He then opened the screen door, and knocked several times, very loudly. He also announced, several times, very loudly: SHERIFF'S DEPARTMENT; PLEASE OPEN THE DOOR … SHERIFF'S DEPARTMENT; OPEN THE DOOR. There was no response. Baldwin Declaration, ¶¶ 9-10.

UMF 8.  Deputy Baldwin, using the key that Ms. Suetos had given him, unlocked the dead bolt in the door, and opened the door. It swung inward, from his right to his left as he was looking at the door. He did not enter the house at that time, but rather announced very loudly: "Sheriff's Department; if you're inside, please come out now." He announced this two  or three times. The house remained dark; and there was no response. Baldwin Declaration, ¶¶ 11, 12.

UMF 9.  At that point, Deputy Baldwin stepped to the side, and Corporal Ray took over, giving the K-9 announcement and warning. Corporal Ray made the announcement two or three times. After the second or third K-9 announcement, a male subject from inside the residence call out: "I'm in here."  Baldwin Declaration, ¶¶ 13, 14.

UMF 10.  Corporal Ray then backed the dog away.  Deputy

7

Baldwin told the man inside the house: "Sir, I want you to come

over here, and I want to see your hands; put your hands in

the air; walk over to the door."  The man responded: "No." There

then appeared to be no need to send the dog in to search for and

hurt someone, so Deputy Baldwin announced that he was coming in.

He was dressed in his Sheriff's Department patrol officer

uniform. Before entering the residence, he announced, two or

three times, loudly, that it was: "Sheriff's Department; I'm

coming in." Baldwin Declaration, ¶¶ 15, 16.

UMF 11.   Deputy Baldwin drew his duty weapon, a .40

caliber semi-automatic pistol, held it in one hand, and

illuminated the interior of the residence with his flashlight.

He walked through the threshold of the doorway, and past the door

which was opened and on his left.  As he got through the doorway

threshold, and past the open door which had swung open and was on

his left, he immediately turned to his left.  He saw a male

subject (later identified as Jeff Gilbert, the plaintiff in this

case) lying on a bed approximately 15 feet away.  Gilbert was

lying on his back, propped up against the wall like one situates

himself or herself when watching TV in bed, with two pillows

behind his head and with his legs extended, his feet generally

pointed toward Deputy Baldwin.  The man was looking at Baldwin,

and he had a bundle of blankets or covers over his chest area.

His hands were under the blanket, and Deputy Baldwin could not

see them. The man was fully dressed wearing a shirt, pants, and

shoes. Corporal Ray was behind Deputy Baldwin, in the threshold

of the doorway. Baldwin Declaration, ¶ 17.

**UMF 12.**  Deputy Baldwin focused on the man in the bed. Because he could not see the man's hands, he told him: "I want to see your hands; let me see your hands now!"  Deputy Baldwin said this several times, very loudly.  Baldwin was shining his flashlight in the man's face, and had his service weapon pointed at him. The man ultimately responded, in a clear, calm voice: "No." Baldwin Declaration, ¶¶ 18, 19.

**UMF 13.**  Deputy Baldwin again commanded, very loudly: "I want to see your hands; I want to see your hands now!" The male subject said in response – "No, I have a gun." Baldwin Declaration, ¶¶ 20-21.

**UMF 14.**  Deputy Baldwin continued to issue the command to let him see the man's hands, at which point the man started to move or pivot to his left, as if to step off the bed, and his right hand came up from underneath the blanket.  Deputy Baldwin saw that the man was holding a silver or nickel-plated pistol. As the man turned off the bed, the pistol came up from under the covers, and the man held it straight out, as he was extending his arm toward Deputy Baldwin, and bringing the gun to point it directly at Baldwin. Baldwin Declaration, ¶ 22.

**UMF 15.**  As the man began this movement, and as soon as Deputy Baldwin saw the gun starting to come up from under the covers, and beginning to be pointed at him, he commanded: "Drop the gun! Drop the gun! Drop the gun!"  As the gun became pointed directly at Deputy Baldwin, he feared for my life, and the life

of Corporal Ray, who was now standing somewhere to his left, with the door blocking his view of the subject.  Deputy Baldwin fired his duty weapon at the subject, successive rounds, in controlled but rapid succession. Deputy Baldwin aimed at his center of mass, as he had been trained to do.  Deputy Baldwin fired until he saw that the male subject was going to the floor.  It appeared to Deputy Baldwin that the man was no longer in possession of the gun and was otherwise no longer an immediate threat to his life. At that time, Deputy Baldwin stopped firing. Deputy Baldwin fired a total of three rounds; his  weapon was loaded with 15 rounds. Baldwin Declaration, ¶¶ 23, 24.

UMF 16.  As Deputy Baldwin stopped firing, the male subject slid off the bed, landed on his knees on the floor, and then fell forward or rolled to the floor.  Corporal Ray covered Baldwin as he holstered his weapon, went to the male subject and located his gun underneath him, after Baldwin rolled Gilbert over onto his back, and put a pillow under his head. Corporal Ray then started administering first aid. Baldwin Declaration, ¶ 25.

UMF 17.  At no time did Deputy Baldwin use any more force, or fire any more rounds, than was necessary to prevent the subject, Gilbert, from firing his weapon at him. Under the circumstances of this encounter with Gilbert, in the dark room, illuminated only by flashlight, it was necessary for Deputy Baldwin to fire his weapon at Gilbert in order to prevent Gilbert from shooting Baldwin, and Corporal Ray, as well. As soon as the threat of death or serious bodily injury to Deputy Baldwin and/or

1  Corporal Ray terminated, Deputy Baldwin immediately stopped
2  firing and stopped all other use of force against Gilbert.
3  Baldwin Declaration, ¶¶ 26, 27.

4      <u>UMF 18</u>.  Deputy Baldwin then immediately called for an
5  ambulance and proper medical attention for Gilbert, and attempted
6  to keep Gilbert calm and comfortable while awaiting medical
7  personnel. During that time, Baldwin asked Gilbert "Why did you
8  point the gun at me?" Gilbert responded: "That was stupid."
9  Baldwin Declaration, ¶ 28.

10      <u>UMF 19</u>.  While waiting for the ambulance, and trying to
11  keep Mr. Gilbert calm, Deputy Baldwin also asked Gilbert if this
12  was his house? And Gilbert said, "No – it wasn't his house."
13  Baldwin then asked what he was doing there, if it wasn't his
14  house? And Gilbert said, "I'm looking for home; I'm lost;
15  confused." Then he began to ramble on about Jesus and some other
16  religious things. Baldwin Declaration, ¶ 29.

17      <u>UMF 20</u>.  As Deputy Baldwin was beginning to enter the
18  residence, Corporal Ray was just behind him, and restraining his
19  K-9, Britt, who had become excited. After Corporal Ray heard
20  Deputy Baldwin issue several commands to Let me see your hands!
21  Sheriff's Department! Let me see your hands!, and after Corporal
22  Ray heard the subject refuse to show his hands, Corporal Ray
23  heard the subject announce that he had a gun, and thereafter,
24  Deputy Baldwin commanded loudly: "Drop the gun! Drop the gun!
25  Drop the gun!" Deputy Baldwin's "Drop the gun!" commands were
26  followed by Deputy Baldwin firing his service weapon three times

1  in rapid succession. Declaration of Corporal Jamery Ray, 9/24/07

2  ("Ray Declaration"), ¶¶ 11, 12, 13.

3       UMF 21.  Both Deputy Baldwin and Corporal Ray were in

4  Deputy Sheriff Uniform, and were on uniformed patrol on that

5  night.  Ray Declaration, ¶ 14.

6       UMF 22.  As soon as Corporal Ray cleared the doorway

7  and could see into the room, after the shots were fired, he

8  observed the male subject on the edge of the bed, sitting

9  somewhat sideways, with his head down, and in a position that

10  would have allowed a kind of somersault off the bed. Gilbert then

11  slid off the bed onto the floor. The subject began yelling: "I'm

12  shot!"  Ray Declaration, ¶ 15.

13       UMF 23.  Deputy Baldwin subsequently asked Mr. Gilbert:

14  "Why didn't you put the gun down?" To this Mr. Gilbert responded:

15  "I don't know. I'm stupid. I didn't want to get into trouble."

16  Ray Declaration, ¶ 16.

17       UMF 24. When Deputy Baldwin was moving Gilbert away

18  from the bed, Corporal Ray saw a silver and black semi-automatic

19  pistol lying on the floor, under the area where Gilbert's stomach

20  had been against the floor.  Ray Declaration, ¶ 17.[2]

21       UMF 25.  The Inyo County Sheriff's Department's Use of

22  Force Policy is set forth at Section 307.00 of the Sheriff's

23  Department manual, and is entitled: "Use of Force." A true and

24  _____

25  [2]Attached to the Ray Declaration is a not-to-scale drawing of
   the room in the Suetos residence where the shooting occurred as
   well as photographs of the scene taken by Corporal Ray on January
26  26, 2004.

correct copy of the Department's Use of Force Policy is attached
as Exhibit A to the Declaration of Lieutenant Stephan J. Rogers,
9/23/07 ("Rogers Declaration").  Section 307.01 provides in
pertinent part:

      A.  While the following guidelines generally
apply, officers are permitted to use any
force which is reasonable to protect
themselves and others from bodily harm while
accomplishing a lawful police purpose.

      B.  Force shall be used at an officer's
discretion:

          1.  When necessary to defend
themselves or others;

          2.  To effect arrests;

          3.  To prevent the commission of a
public offense.

      C.  Officers must maintain control of all
enforcement situations at all times.
Suspects should not be allowed to gain the
advantage in a physical confrontation.

      D.  The use of physical force shall be
restricted:

          1.  To circumstances authorized by
policy or law;

          2.  To the level necessary to
accomplish a law enforcement task.

      E.  Deadly force may only be used:

          1.  As a means of self defense, to
defend the life of another Peace
Officer, or to defend the life of a
victim, witness, or the public from
an immediate threat of death or
violent injury;

          2.  To prevent a crime in which
human life is in immediate threat
of death or violent injury as a

result of the suspect's action;

...

F.   Use of Force Continuum:

1.   Levels of force are used as
needed, there is not a 'ladder' of
force that must be followed.  The
officer shall choose the available
force option, which is reasonable
and necessary to effectively
establish control of the situation.

UMF 26.  All Inyo County Sheriff's Deputies are
trained to the "Use of Force" Policy.  It is the policy  required
of all Sheriff's Deputies when performing their duties. Rogers
Declaration, ¶ 7.

UMF 27.  There is no unwritten accepted practice, no
unwritten accepted custom, and no unwritten policy, of a standard
for the implementation or use of force by Inyo County Sheriff's
Department Deputies other than the Department's formal and
written "Use of Force" Policy.  Rogers Declaration, ¶ 8.

UMF 28.  The Inyo County Sheriff's Department's Use of
Force Policy complies with the standards and requirements of the
California Commission on Peace Officer Standards and
Training. Rogers Declaration, ¶ 5; Declaration of San Bernardino
County Sheriff's Department Captain Robert Fonzi, 9/25/07 ("Fonzi
Declaration"), ¶ 10.

UMF 29.  Both Deputy Baldwin and Corporal Ray had been
trained in the California P.O.S.T. compliant Use of Force policy
of the Inyo County Sheriff's Department, prior to the events

14

1  occurring January 26, 2004, involving Gilbert. Rogers

2  Declaration, ¶ 9.

3         **UMF 30**.  On February 9, 2004, Inyo County Sheriff's

4  Department Lieutenant Rogers chaired a Shooting Review Board,

5  which reviewed and evaluated the decisions and actions of Deputy

6  Baldwin and Corporal Ray on the night of January 26, 2004,

7  involving Gilbert. After reviewing the Sheriff's Department

8  policy on the Use of Force, the actions of Deputy Baldwin and

9  Corporal Ray, and the actions of the Gilbert, it was concluded by

10 the Shooting Review Board that the shooting was within Department

11 policy and consistent with current training standards for use

12 of force by peace officers in California. Rogers Declaration, ¶¶

13 10, 11.

14        **UMF 31**.  The use of force by Deputy Baldwin on the

15 night of January 26, 2004, in firing his weapon at a suspect who

16 refused to show his concealed hands, after being repeatedly

17 ordered by a uniformed Deputy Sheriff to do so, and who then

18 presented a previously concealed pistol in his hand, and then

19 refused to drop the pistol upon after being ordered to do so by

20 the Deputy, and who actually extended his arm and the pistol

21 toward the Deputy, pointing the pistol directly at him,

22 constituted a justifiable use of deadly force by Deputy Baldwin

23 to protect himself and others from death or serious bodily

24 injury, and was not an excessive use of force. Rogers

25 Declaration, ¶ 12.

26        **UMF 32**.  The use of deadly force by Deputy Baldwin was

15

reasonable based upon his perception, observation, and fear for his safety and that of Corporal Ray.  Deputy Baldwin's use of deadly force comports with both state and national standards and training.  Fonzi Declaration, ¶ 10.

UMF 33.  Deputy Baldwin followed appropriate state law, department policies, and training as it relates to the use of deadly force.  Fonzi Declaration, ¶ 10.

UMF 34.  Deputy Baldwin fired three rounds, and he stopped firing when he perceived that the deadly threat was terminated.  Deputy Baldwin had an additional 12 rounds in his duty weapon that were available to him, but which he did not fire, because of his perception that the need to do so had ended. This is consistent and in compliance with Inyo County Sheriff's Department training and policy, and with the California Commission on Peace Officer Standards and Training use of force policy in California.  Rogers Declaration, ¶ 13.[3]

UMF 35.  Under similar circumstances, most if not all reasonable peace officers would have acted just as did Deputy Baldwin in firing his weapon repeatedly at a burglary suspect who was pointing a handgun at him. Rogers Declaration, ¶ 15.B.; Fonzi

_____

[3]Defendants submit evidence that Deputy Baldwin acted in a professional manner by immediately calling for medical assistance for Gilbert, and in acting to comfort and keep the wounded Gilbert calm, thus helping to prevent Mr. Gilbert from going into shock, after the shooting. Rogers Declaration, ¶ 14.  This evidence is not relevant to Plaintiff's claim of excessive force.
38.  Deputy Paul Baldwin used reasonable force only, and not excessive force, in dealing with threat of the semi-automatic pistol being pointed at him by Mr. Gilbert. Rogers Declaration, para 15.A.; Fonzi Declaration, para 17.A.

Declaration, ¶ 17.B.

UMF 36.  Deputy Baldwin's use of force to stop the threat of death or serious bodily injury that he was facing did not call for Corporal Ray to intercede or attempt to stop Deputy Baldwin from protecting himself against the deadly threat being presented by Gilbert.  Rogers Declaration, ¶15.C.; Fonzi Declaration, ¶ 17.C.

UMF 37.  Under similar circumstances, most if not all reasonable peace officers would have acted just as did Corporal Ray, in not interceding and attempting to stop Deputy Baldwin from protecting himself.  Rogers Declaration, ¶ 15.D.; Fonzi Declaration, ¶ 17.D.

UMF 38.  The response, tactics, and communication displayed by the Deputies, initially, during, and at the conclusion of the incident, were reasonable based on officers' perception and the totality of the circumstances. Fonzi Declaration, ¶ 10.

UMF 39.  It was reasonable for the Deputies to approach Gilbert, who was located inside the residence, based on their perception, training, and experience as it relates to burglary suspects and the risk to public safety. Fonzi Declaration, ¶ 10.

UMF 40.  The use of deadly force by Deputy Baldwin was reasonable based upon his perception, observation, and fear for his safety and that of Corporal Ray.  Deputy Baldwin's use of deadly force comports with both state and national standards and training.  Deputy Baldwin followed appropriate state law,

department policies, and training as it relates to the use of deadly force. Fonzi Declaration, ¶ 10.

UMF 41.  Corporal Ray followed appropriate state law, department policies, and training as it relates to a deadly force encounter and declining to intercede to stop Deputy Baldwin from protecting himself. Fonzi Declaration, ¶ 10.

UMF 42. Nothing in this incident supports a finding or a claimed existence of any custom, policy, or practice that encourages or condones the use of excessive force by members of the Inyo County Sheriff's Department. Fonzi Declaration, ¶ 10.

UMF 43.  Nothing in this incident supports a propensity for violence on the part of Deputy Baldwin or Corporal Ray that contributed to the decision to use deadly force against Gilbert. Fonzi Declaration, ¶ 10.

UMF 44.  As a result of the following, Gilbert posed an immediate and deadly threat to the Deputies because of his actions:

a. According to police reports and statements, Gilbert refused to comply with or surrender to both Deputy Baldwin's and Corporal Ray's simple and uncomplicated commands.

b. Instead, Gilbert verbally refused to come out, which forced the Deputies to enter the residence.

c. Additionally, when confronted inside the residence, Gilbert refused to show his hands, which were concealed under a blanket.

d. When Gilbert removed his hands from the blanket, he

had a handgun in his right hand, and proceeded to extend his arm
and point the weapon directly at Deputy Baldwin in a life-
threatening manner.

      e. Gilbert refused to drop the handgun when ordered to
do so by Deputy Baldwin.

      f. It was obvious that Gilbert posed an immediate and
deadly threat to the Deputies because of his actions.

      g. The decision not to release the canine into the
residence, after a person ultimately called out from inside, was
reasonable for several reasons, including without limit that it
was unknown whether the person who called out was ill, injured,
handicapped, simply intoxicated, or otherwise incapacitated.
Fonzi Declaration, ¶ 11.

      **UMF 45**.  It is reasonable to assess and assume that
Gilbert posed an imminent threat to both the Deputies and the
community based on Gilbert's unauthorized entry into someone
else's residence and the fact he was armed with a handgun. Fonzi
Declaration, ¶ 13.

      **UMF 46**.  This incident had a significant degree of
uncertainty and was obviously tense and rapidly changing. In a
matter of seconds, the seriousness of the crime escalated from
burglary, up to and including brandishing a firearm, and assault
on a police officer with a handgun.  Fonzi Declaration, ¶ 14.

      **UMF 47**.  There is clear evidence that Gilbert posed a
significant threat to the Deputies, which culminated in Gilbert
displaying and pointing his handgun at Deputy Baldwin in a

lifethreatening manner. At the same time, there is no evidence that supports that the Deputies engaged in excessive force. Fonzi Declaration, ¶ 15.

**UMF 48**. The response and action of both Deputy Baldwin and Corporal Ray was appropriate and reasonable given the information and circumstances. It was obvious that Gilbert posed an immediate and deadly threat to the Deputies because of his actions.

**UMF 49**. The use of deadly force against Gilbert by Deputy Baldwin comports with the training, policies, and practices commonly recognized by the law enforcement community. Fonzi Declaration, ¶ 18.

**UMF 50**. Such circumstances, if repeated, would predictably cause trained law enforcement personnel to respond and act in the same manner, regardless of jurisdiction or agency.  Fonzi Declaration, ¶ 19.

**UMF 51**. The handgun that Gilbert admits to pointing at Deputy Baldwin is a .380 caliber Bersa Thunder semi-automatic pistol.  It was recovered at the scene of the shooting on the night of the shooting. Declaration of Inyo County Sheriff's Department Undersheriff John N. Eropkin, 9/25/07 ("Eropkin Declaration"), ¶ 5.[4]

**UMF 52**. A photograph taken of Gilbert's gun in the condition in which it was recovered, shows that the hammer was

---

[4]Attached to Eropkin's Declarations are photographs of the residence where the incident took place and of Gilbert's gun.

1  back and the safety was in the off position.  There was a live

2  round in the chamber, along with a fully loaded 7-round magazine.

3  The weapon was fully ready to fire, merely by applying light

4  pressure to the trigger. Eropkin Declaration, ¶ 8.

5       **UMF 53.**  Gilbert was convicted by guilty plea of

6  Assault on a Police Officer with a Deadly Weapon, namely, a

7  firearm, in violation of California Penal Code Section

8  245(d)(2), as a result of the events of January 26, 2004.

9  Gilbert was sentenced to eight years in State Prison following

10  that conviction.  Request for Judicial Notice, Exhibits A and B.

11       **UMF 54.**  On the night of January 26, 2004, Mr. Gilbert

12  made the conscious and deliberate decision to use his pistol to

13  provoke the Inyo County Deputy Sheriffs into fearing for their

14  life, and into therefore shooting and killing him (Mr. Gilbert),

15  as a form of suicide.  Deposition Testimony of Gilbert, 94:2-

16  103:2.

17       **UMF 55.**  Gilbert had been having suicidal thoughts for

18  several months prior to January 26, 2004, and on more than 50

19  occasions contemplated killing himself, including at putting his

20  pistol in his mouth, and otherwise up to his head. Deposition

21  Testimony of Gilbert, 57:17-58:21, 82:15-24.

22       **UMF 56.**  Gilbert did not actually pull the

23  trigger and shoot himself because he was afraid that the single

24  self-inflicted gunshot he could fire might not be enough to

25  actually kill him, and he did not want to live in some kind of

26  "vegetable" state, in the event he survived the single shot he

could fire himself.  Deposition Testimony of Gilbert, 82:15-
83:13.

    C.  <u>QUALIFIED IMMUNITY</u>.

    Defendants Baldwin and Ray move for summary judgment with
regard to Plaintiff's claims of excessive force on the ground of
qualified immunity from liability pursuant to 42 U.S.C. § 1983.

    Although the Amended Complaint alleges that Plaintiff's
rights to due process and equal protection of the laws under the
Fourteenth Amendment were violated by the officers' use of
excessive force, all claims of excessive force are analyzed under
the objective reasonableness standard of the Fourth Amendment set
forth in *Graham v. Connor,* 490 U.S. 386 (1989) and *Tennessee v.
Garner*, 471 U.S. 1 (1985).

    Qualified immunity serves to shield government officials
"from liability for civil damages insofar as their conduct does
not violate clearly established or constitutional rights of which
a reasonable person would have known." *Harlow v. Fitzgerald*, 457
U.S. 800, 818 (1982).  The Supreme Court has set forth a two-
pronged inquiry to resolve all qualified immunity claims.  First,
"taken in the light most favorable to the party asserting the
injury, do the facts alleged show the officers' conduct violated
a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201
(2001).  If the court determines that the conduct did not violate
a constitutional right, the inquiry is over and the officer is
entitled to qualified immunity.  However, if the court determines
that the conduct did violate a constitutional right, *Saucier*'s

second prong requires the court to determine whether, at the time of the violation, the constitutional right was "clearly established." *Id*. "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id*. at 202. The inquiry is wholly objective and is undertaken in light of the specific factual circumstances of the case. *Id*. at 201. Even if the violated right is clearly established, *Saucier* recognized that, in certain situations, it may be difficult for a police officer to determine how to apply the relevant legal doctrine to the particular circumstances he faced. If an officer makes a mistake in applying the relevant legal doctrine, he is not precluded from claiming qualified immunity so long as the mistake is reasonable. If "the officer's mistake as to what the law requires is reasonable, ... the officer is entitled to the immunity defense." *Id*. at 205. In *Brosseau v. Haugan*, 543 U.S. 194 (2004), the Supreme Court reiterated:

> Qualified immunity shields an officer from suit when she makes a decision that, even if constitutionally deficient, reasonably misapprehends the law governing the circumstances she confronted. *Saucier v. Katz*, 533 U.S., at 206 (qualified immunity operates 'to protect officers from the sometimes "hazy border between excessive and acceptable force"'). Because the focus is on whether the officer had fair notice that her conduct was unlawful, reasonableness is judged against the backdrop of the law at the time of the conduct. If the law at that time did not clearly establish that the officer's conduct would violate the Constitution, the

officer should not be subject to liability
or, indeed, even the burdens of litigation.

It is important to emphasize that this
inquiry 'must be undertaken in light of the
specific context of the case, not as a broad
general proposition.' *Id.*, at 201.  As we
previously said in this very context:

> '[T]here is no doubt that *Graham v.
> Connor, supra*, clearly establishes
> the general proposition that use of
> force is contrary to the Fourth
> Amendment if it is excessive under
> objective standards of
> reasonableness.  Yet, that is not
> enough.  Rather, we emphasized in
> *Anderson* [*v. Creighton*] "that the
> right the official is alleged to
> have violated must have been
> 'clearly established' in a more
> particularized, and hence more
> relevant, sense: The contours of
> the right must be sufficiently
> clear that a reasonable officer
> would understand that what he is
> doing violates that right.' ...
> The relevant, dispositive inquiry
> in determining whether a right is
> clearly established is whether it
> would be clear to a reasonable
> officer that his conduct was
> unlawful in the situation he
> confronted.' ...

The Court of Appeals acknowledged this
statement of law, but then proceeded to find
fair warning in the general tests set out in
*Graham* and *Garner* ... In so doing, it was
mistaken.  *Graham* and *Garner,* following the
lead of the Fourth Amendment's text, are cast
at a high level of generality.  See *Graham v.
Connor*, *supra*, at 396 ('"[T]he test of
reasonableness under the Fourth Amendment is
not capable of precise definition or
mechanical application"').  Of course, in an
obvious case, these standards can 'clearly
establish' the answer, even without a body of
relevant case law.'

543 U.S. at 198-199.  However, as explained in *Wilkins v. City of*

24

*Oakland*, 350 F.3d 949, 956 (9th Cir.2003), *cert. denied sub nom.*
*Scarrot v. Wilkins*, 543 U.S. 811 (2004):

> Where the officers' entitlement to qualified
> immunity depends on the resolution of
> disputed issues of fact in their favor, and
> against the non-moving party, summary
> judgment is not appropriate. *See Saucier*,
> 533 U.S. at 216 ... (Ginsberg, J.,
> concurring)('Of course, if an excessive force
> claim turns of which of two conflicting
> stories best captures what happened on the
> street, *Graham* will not permit summary
> judgment in favor of the defendant
> official.').

"Determining whether the force used to effectuate a
particular seizure is reasonable under the Fourth Amendment
requires a careful balancing of the nature and quality of the
intrusion on the individual's Fourth Amendment interests against
the countervailing governmental interests at stake. *Graham v.
Connor*, *supra*, 490 U.S. at 396.  This balancing test entails
consideration of the totality of the facts and circumstances in
the particular case, including "the severity of the crime at
issue, whether the suspect poses an immediate threat to the
safety of the officers or others, and whether he is actively
resisting arrest or attempting to evade arrest by flight." *Id*.
The most important of these factors is the threat posed by the
suspect. *Smith v. City of Hemet*, 394 F.3d 689, 702 (9th Cir.),
*cert. denied*, 545 U.S. 1128 (2005).  In *Garner*, the Supreme Court
explained that, while it is unreasonable to apprehend an unarmed,
nondangerous suspect by killing him, "[w]here the officer has
probable cause to believe that the suspect poses a threat of

serious physical harm, either to the officers or to others, it is
not constitutionally unreasonable to prevent escape by using
deadly force [and] if the suspect threatens the officer with a
weapon or there is probable cause to believe that he has
committed a crime involving the infliction or threatened
infliction of serious physical harm, deadly force may be used if
necessary to prevent escape, and, if, where feasible, some
warning has been given." *Tennessee v. Garner*, *supra*, 471 U.S. at
11-12.  The "broad discretion that must be afforded to police
officers who face a tense situation," must be extended to
mistakes of fact concerning "the existence of probable cause" as
well as to mistakes as to what the law requires under the
particular circumstances.  *Jeffers v. Gomez*, 267 F.3d 895, 909
(9th Cir.2001).  "The reasonableness of a particular use of force
must be judged from the perspective of a reasonable officer on
the scene, rather that with the 20/20 vision of hindsight."
*Graham*, 490 U.S. at 396.  The "question is whether the officers'
actions are 'objectively reasonable' in light of the facts and
circumstances confronting them, without regard to their
underlying intent or motivation."  *Id.* at 397.

Defendants argue that the undisputed facts set forth above
demonstrate that Deputy Baldwin was faced with a serious and
deadly threat by Plaintiff.  Plaintiff was sitting in the dark
in a private residence without permission from the owner of the
residence.  When Deputy Baldwin entered the residence after
announcing his identity, he saw Plaintiff sitting on a bed with

his chest area covered.  Deputy Baldwin, whose gun was drawn, ordered Plaintiff repeatedly to show his hands.  Plaintiff refused to do so by saying "no" to each of the officer's commands to put his hands in sight and to put the gun down.  Plaintiff told Deputy Baldwin that he, Plaintiff, had a gun.  Plaintiff then pivoted as if to get off the bed and brought his gun from under the covers and pointed it directly at Deputy Baldwin. Deputy Baldwin ordered Plaintiff to drop the gun and, when Plaintiff continued to point his gun at him, fired three shots in rapid succession at Plaintiff's center of mass, and ceased firing when he saw Plaintiff going to the floor.

These undisputed facts establish as a matter of law that Deputy Baldwin did not violate Plaintiff's right against excessive force in violation of the Fourth Amendment.  Deputy Baldwin was faced with an immediate and serious threat of deadly force and personal safety.  Deputy Baldwin fired his weapon only to the extent necessary to subdue Plaintiff, and remove the firearm from Plaintiff.  Although Plaintiff alleges that the second and third shots were not necessary because the first shot had severed his finger, he presents no evidence to support this contention, presents no evidence that Deputy Baldwin's first shot disabled and disarmed him, and presents no evidence that Deputy Baldwin had knowledge of the effect of the first shot on his finger.

Because Deputy Baldwin did not violate Plaintiff's right to be free from excessive force, pursuant to *Saucier*, Deputy Baldwin

27

is entitled to summary judgment.  He is qualifiedly immune from

further suit.  No reasonable officer would have responded

differently.

With regard to Plaintiff's claim against Corporal Ray for

failure to act, because Deputy Baldwin did not violate

Plaintiff's Fourth Amendment right, Corporal Ray is also entitled

to summary judgment.  Although an officer has a duty to intervene

when a fellow officer violates the constitutional rights of a

suspect or citizen, *United States v. Koon*, 34 F.3d 1416, 1447

n.25 (9th Cir.1994), *rev'd on other grounds*, 518 U.S. 81 (1996),

an officer can be held liable for failing to intercede only if

the officer had a realistic opportunity to intercede, *Cunningham*

*v. Gates*, 229 F.3d 1271, 1289-1290 (9th Cir.2000).  Here,

Plaintiff  presents no evidence that Corporal Ray had a realistic

opportunity to intervene to prevent Deputy Baldwin's firing of

the second and third shots, as the time interval was short and

the sequence of events continuous.

D.  <u>Liability of Inyo County</u>.

Because summary judgment for Deputy Baldwin and Corporal Ray

is granted, it is unnecessary to address Plaintiff's claim that

Inyo County is liable for the alleged constitutional violation.

The undisputed facts set forth above, however, demonstrate

that Inyo County has no liability under Section 1983 as a matter

of law.

In *Monell v. New York City Dept. of Social Services*, 436

U.S. 658, 692 (1978), the Supreme Court limited a local

28

government's liability under Section 1983 to those cases where "some official policy 'causes' an employee to violate another's constitutional rights."

> [A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents.  Instead, it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983.

*Id.* at 694.  Since "Congress did not intend municipalities to be held liable unless action pursuant to official municipal policy of some nature caused a constitutional tort[,] ... a municipality cannot be held liable solely because it employs a tort feasor - or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.  *Id.* at 691.  A municipality will be held liable under § 1983 only if "the municipality itself causes the constitutional violation at issue."  *Canton v. Harris*, 489 U.S. 378, 385 (1989).  "City policy 'causes' an injury where it is the 'moving force' behind the constitutional violation ... or where 'the city itself is the wrongdoer."  *Chew v. Gates*, 27 F.3d 1432, 1444 (9th Cir.1994).

The undisputed facts set forth above demonstrate as a matter of law that the Inyo County had in place a reasonable Use of Force Policy and that its officers, including Deputy Baldwin and Corporal Ray, were trained pursuant to the Use of Force Policy as well as receiving POST training on the use of force.  There is no basis to impose liability on Inyo County pursuant to *Monell*.

29

1

**CONCLUSION**

2       **For the reasons stated above:**

3       **1.   Defendants' motion for summary judgment is GRANTED;**

4       **2.   Counsel for Defendants shall prepare and lodge a form of**

5  **order that the rulings set forth in this Memorandum Decision**

6  **within five (5) days following the date of service of this**

7  **decision.**

8       IT IS SO ORDERED.

9  **Dated:    October 29, 2007                    /s/ Oliver W. Wanger**
                                        UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26